**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Danish Surcoon ALI, Defendant–
Appellant.**

No. 99–4086.

United States Court of Appeals,
Sixth Circuit.

March 26, 2002.

Before KENNEDY and DAUGHTREY, Circuit Judges, and BELL,* District Judge.

PER CURIAM.

The defendant, Danish Ali, was convicted of two counts of conspiring to engage in cocaine trafficking and was sentenced to concurrent prison terms of 195 months. On appeal, he raises numerous issues, including allegations of error by the district court in joining defendants and offenses for trial, in evaluating the sufficiency of the evidence, in admitting certain opinion testimony, in refusing to allow the defendant to reopen his proofs, in allowing prejudicial cross-examination of character witnesses, and in determining the appropriate sentence to be imposed. Because we conclude that none of the issues raised by Ali involves reversible error, we affirm the judgment of the district court in its entirety.

### FACTUAL AND PROCEDURAL BACKGROUND

Danish Ali was indicted, along with 49 other individuals, for his participation in cocaine distribution activities in the Cleveland, Ohio, area. The defendant was named in four counts of the 98–count charging instrument—two counts of conspiracy and two counts of using a telephone to commit a felony drug offense. Only three of the 50 co-defendants, Ali, Michael Hawkins, and Andre Lindsay, were ultimately tried together, however.

At that trial, the government presented numerous witnesses to establish the existence of two distinct cocaine distribution conspiracies, one that operated between approximately November 1997 and July 15, 1998 (count 20 of the indictment) and one beginning as early as the fall of 1994 and continuing through May 1998 (count 93 of the indictment). To establish the defendant's connection with the earlier conspiracy (count 93), the prosecution relied heavily upon the testimony of Enrique Alberto Isaza, a Colombian national. Isaza testified that he often traveled from the New York/Newark area to Cleveland, Ohio, on behalf of Maria Teresa Serna, another Colombian who had ties with cocaine producers in her native country. According to Isaza, Serna introduced him to Ali, to whom he eventually made a number of large cocaine sales. Although Isaza could not remember "with precision" all the sales he and Serna made to Ali, he did

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

recall that "the first time we delivered three, three kilos of cocaine. And there were two times when we delivered five on each occasion; on one occasion four; two deliveries of ten each; one delivery of 14." In exchange, Ali paid the Colombians monetary amounts ranging from $10,000 to $400,000.

On some of their business trips to Cleveland, Isaza and Serna would stay at area hotels. On other occasions, however, the couple would stay at an apartment furnished them by Ali. Isaza also offered other evidence of the drug kingpins' relationship with the defendant, including information on the special code number assigned to contacts with Ali, on the methods by which Isaza and Serna communicated with the defendant, and on drugs "fronted" to Ali and the defendant's repayment history.

Much of the evidence regarding Ali's participation in the count 20 conspiracy was provided by co-conspirator Joseph Adams and was corroborated by the introduction of tapes and transcripts of telephone conversations between Adams and Ali. For instance, the government established by those means that the defendant and Adams sold each other cocaine in amounts ranging from four-and-one-half ounces to a kilogram at a time during the winter of 1997–1998. The testimony further established that the defendant volunteered to and actually did introduce Adams to his Colombian "contacts" in exchange for "some of the profits that [Adams] made," and that on at least one occasion, Ali telephoned Adams to warn him that federal agents were making arrests around the area and to inform him that he (Ali) intended to stop selling cocaine for a short time as a result.

In light of the damning evidence against Ali, the jury convicted the defendant of the conspiracies alleged in counts 20 and 93 of the indictment. Those same fact-finders, however, voted to acquit Ali of the two charges involving the use of a communications device to commit a drug felony. After a sentencing hearing, the district judge then ordered Ali to serve 195 months in prison as a criminal history category II, offense level 34 offender. Ali now appeals.

## DISCUSSION

### I. Joinder of Offenses and Defendants

■ In his first issue of appeal, Ali contends that the district court should have granted his motion for severance of offenses and defendants at trial because much of the evidence adduced did not apply to him, thus prejudicing the presentation of his case. Although Ali raised this issue pretrial, he failed to renew the motion at the close of all the evidence. The allegation of error is thus not properly before us because, as we previously indicated in *United States v. Swift,* 809 F.2d 320, 323 (6th Cir.1987), "a severance motion will be deemed waived if it is not renewed at the end of the evidence."

### II. Sufficiency of the Evidence

■ Ali next claims that the evidence introduced at trial does not meet the constitutional standards necessary to support his convictions. Specifically, he contends that he was nothing more than a buyer or seller of cocaine on a large scale and, therefore, not acting as a co-conspirator. He further insists that he did not benefit from his transactions or from any agreement and that the incriminatory conversations between Adams and him that were intercepted by authorities are as consistent with discussions between independent actors as they are with co-conspirator dealings.

Our recitation of the evidence as set out above, however, demonstrates that there

existed a broad distribution agreement and that Ali was an active participant in that collective action, even to the extent of attempting to involve other individuals in the "organization." We conclude that a rational trier of fact would be justified in finding Ali guilty beyond a reasonable doubt of the offenses charged in counts 20 and 93 of the relevant indictment, which is sufficient to satisfy the applicable standard of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### III. Opinion Testimony of Special Agent Vogt

█ In another issue, Ali objects to the district court's admission of certain testimony offered by the government's initial witness at trial, Federal Bureau of Investigation Special Agent Stephen Vogt. The defendant now contends that Vogt improperly offered his opinion concerning the meaning of some of the telephone conversations intercepted and transcribed during the investigation of the conspiracy. According to the defense's argument, such evidence purported to be expert opinion, but Vogt was not qualified, at the time of his testimony, to be anything other than a fact witness.

Ali is correct in asserting that this court has recognized that "there is a significant risk that the jury will be confused by the officer's dual role" when a law enforcement official testifies in a single case as both a fact witness and an expert witness. *See United States v. Thomas*, 74 F.3d 676, 682 (6th Cir.1996), *overruled on other grounds in Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir.1998). Nevertheless, there is no *per se* prohibition on such a practice, especially "[i]f the district court and the prosecutor take care to assure that the jury is informed of the dual roles." *United States v. Tocco*, 200 F.3d 401, 418 (6th Cir.2000).

Although the district court and the government did not specifically address the jurors regarding Vogt's "dual role," no reversible error is present in this regard because it was the defendant himself who invited any error that he now alleges occurred. The prosecution originally presented Vogt as a witness only to explain the FBI's investigation into drug trafficking in the Cleveland area, the process of obtaining wiretaps on the telephones of Joseph Adams, and to introduce a certain tape and transcript of one of Adams's telephone conversations in order to explain why the FBI effected a particular arrest. On cross-examination, it was defense counsel who interrogated Vogt about the meaning of certain phrases used during the phone calls and about the agent's opinion as to whether the communication involved drug dealing. Moreover, after eliciting such information, defense counsel attempted to discredit Vogt's conclusions, thus justifying the government's later questioning on redirect to allow the agent to explain the bases for the defense-elicited conclusions and opinions.

When a defendant himself invites an alleged error of which he later complains on appeal, this court will not generally grant relief to that party unless "the interests of justice demand otherwise." *See United States v. Barrow*, 118 F.3d 482, 490–91 (6th Cir.1997). Because there is no reason in this case to relieve the defendant from the consequences of his own trial decisions, and because Vogt continually asserted that certain testimony that Ali now finds objectionable was only his opinion and not necessarily fact, the defendant's allegations of error in this regard are without merit.

### IV. Refusal to Allow Defendant to Reopen Case

█ Ali next submits that the district judge erred in failing to allow him to re-

open his case after the close of all evidence in order to add to a *government* exhibit a hotel telephone log that purported to establish that the defendant did not receive a particular phone call attributed to him by the prosecution. Of course, the admission of evidence at trial is a matter within the discretion of the district judge and a trial court's ruling on such a request will not be disturbed absent an abuse of that discretion. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 716 (6th Cir.1999).

In discussing the request to reopen the proofs in this matter, defense counsel admitted that the log he wished to enter into evidence had been submitted to the defense well in advance of trial, even though the attorney himself had not come across the document until the weekend prior to the motion. Consequently, the district judge ruled:

> I'm not going to require [the government] to add to their exhibit something which was not identified by a witness in the case. Their case is closed. There was an opportunity to cross-examine the witness in regard to what was presented. There is a chance to present to the witness as your own exhibit a phone log if you thought that that was pertinent to your case.

> The government can pick and choose, defendants can pick and choose what they want to introduce and what they don't. That's why they are required to reveal in discovery a range of information, so if you think they are not introducing everything that's pertinent to your defense, you can pull it out and bring it forward. And I don't find, especially in a situation where you are just making an argument that no call was made, something which they haven't contradicted or they don't intend to take

issue with that, that no call was made from the Ramada Inn to your client on that night, that that is such as to take the extraordinary step of requiring the government to introduce something which they did not get authenticated, what they did not choose to introduce through a witness.

Despite the court's thorough analysis on the record, Ali insists that the district judge did not fully evaluate the motion to reopen the proofs as required in *United States v. Blankenship,* 775 F.2d 735 (6th Cir.1985). In *Blankenship,* we quoted with approval the Fifth Circuit decision in *United States v. Thetford,* 676 F.2d 170, 182 (5th Cir.1982), for the proposition that, "[i]n exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of granting the motion." *Blankenship,* 775 F.2d at 741. In light of the district judge's recognition that the defense had the opportunity to introduce the document during its cross-examination of the government witness or during its case-in-chief, and that no witness authenticated the document at issue, or that the defense even offered to call such an authenticating witness, the district court did indeed undertake the required balancing of the *Blankenship* factors. A critical review of that analysis indicates that the district judge did not abuse his wide discretion in choosing not to reopen this case and that he appropriately ruled that the defense's motion was without merit.

## V. Cross–Examination of Defense Character Witnesses

■ Next, Ali submits that the district judge erred in allowing the prosecution to cross-examine the defendant's character witnesses about threats made by Ali in connection with prior domestic violence charges. Rule 405(a) of the Federal Rules

of Evidence clearly allows reputation testimony to be introduced "[i]n all cases in which evidence of character or a trait of character of a person is admissible." On cross-examination, moreover, "inquiry is allowable into relevant specific instances of conduct." *Id.*

Consequently, when defense counsel elicited from Ali's mother that she was aware of her son's reputation and that he had never been considered a "bully," the government was justified in cross-examining her by inquiring whether she was aware of certain instances of conduct that would refute that stated reputation. In doing so, the prosecution asked whether the defendant's mother was aware of the following statements made by Ali to his wife over the telephone in the midst of a domestic dispute:

> I tell you one thing, if I stay in that mother fucking jail cell, I'll, I guarantee you won't live to talk about it. I got enough God damn followers that you won't breathe two mother fucking minutes after I'm behind bars. I blink my mother fucking eye, you die in the dark. You forget who you fucking with. I can make this mother fucking earth move at the pace that I want it to, that's what you fail to realize. You really don't know who you are fucking with. Don't interrupt me. Shut the fuck up until I finish talking. I called to place you in your mother fucking place like a man should have done. You about to find out the hard way. Don't talk over me, that's an order. And you want to call the police? Police? Bitch, that's the last place I scared of is jail. If they lock me up more than 30 days, you die in the dark. I'm not the one to fuck with. I change people's lives. I'm going to put you in a mother fucking wheelchair, your spine will be broken if you fuck with me, I'll cut your mother fucking vocal cords out, you'll never talk again.

> The world can't protect you. You think the police can protect you. They can't protect everybody. Don't be that stupid. If that were the case, nobody would be getting killed. You think the law can protect you from a cold mother fucking murderer? That's the kind of power I got. Mother fucking baddest men in the world listen to me, that's just the way it is. You don't know your place. You're abusing the fact that I allow you to talk. Learn your place when I'm around.

Ali now claims that such information was improper cross-examination material because of the inherently private nature of the conversation. In support of that argument, the defendant cites the Eighth Circuit decision in *United States v. Monteleone*, 77 F.3d 1086, 1090 (8th Cir.1996), in which the court concluded that "if the suggested occurrences were essentially private in nature and not likely to have been known in the community at large, then the questions cannot possibly be intended 'to test the accuracy, reliability, or credibility of the [reputation witness's] testimony.'" (Citation omitted.) Despite the fact that the information referenced by the prosecution in this case involved a domestic dispute, that exchange between Ali and his wife cannot be considered so private that it would not have affected the defendant's reputation. Indeed, the government was able to obtain a transcript of the berating telephone conversation solely because a tape of the call had been played in open court during the state court proceedings resulting from the threats. Because the violent aspect of Ali's nature was so publicly demonstrated, it is logical to presume that other individuals in the community would have been aware of the defendant's reputation in dealing with persons less powerful than himself. The concerns ex-

pressed in *Monteleone* are thus not implicated in this matter.[1]

■ Ali also insists before this court that the district judge should have granted his motion for a mistrial after the prosecution improperly questioned the defendant's wife concerning the fact that Ali had previously threatened *to kill* her. Such testimony, argues the defendant, was unduly prejudicial and far outweighed any probative value the cross-examination might have had for the case.

During direct examination of the defendant's wife, defense counsel engaged her in the following exchange:

Q [Ali]'s not a drug dealer, is he?

A No, he's not.

Q Now, ma'am, you do understand that you are under oath here?

A Yes, I do.

Q Would you lie to protect him?

A No, I wouldn't.

Q And are you lying when you say he is not a drug dealer?

A No, I'm not.

In an effort to establish the witness's potential bias, despite her denials, however, the prosecution sought permission to question the defendant's wife about the fact that, in the context of the previously-discussed domestic relations dispute, he had threatened her with death if she were to testify against him. The district judge, concerned about the prejudicial impact of such inflammatory information, decided to limit any questioning on motives or bias by ruling:

> And I think the most I'm going to let you do is to ask her has he threatened you, but he has threatened you in the past, and if the answer is yes, then it seems to me all you have left is "But you are saying that didn't happen this time or you still maintain you are not afraid." And you have to keep it in that conclusory way.

Nevertheless, the prosecutor contravened the court's directive by asking not merely whether the defendant had previously threatened his wife in relation to court testimony, but rather, whether "he has threatened to kill you." An immediate objection was raised and a heated side-bar conference occurred. Ultimately, the district court denied the defense request for a mistrial, but ordered the jury to disregard the objectionable inquiry and the prosecutor to move to a different line of questioning.

We review a denial of a motion for a mistrial for an abuse of discretion. *See United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir.1994). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.,* 102 F.3d 777, 780 (6th Cir.1996) (quoting *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir.1989)). A review of the voluminous record in this case indicates that the district judge committed no such clear error of judgment in denying the requested mistrial. Despite the govern-

---

1. Ali now maintains that the entire line of questioning was improper because it was based upon the prosecution's misunderstanding of defense counsel's inquiry that allegedly "opened the door" for such cross-examination. The defendant claims that the questions propounded to Ali's mother about her son's reputation as a bully, and the mother's answers, related only to his school-age years and his reputation at that time. In fact, however, the question asked to Ali's mother was whether Danish "ever" had a reputation for being a bully. Moreover, the mother's comments on cross-examination regarding the defendant were that "he's not a bully," indicating her opinion of her son includes present-day impressions.

ment's apparent disregard of the district court's instructions on the permissible scope of cross-examination, it appears that the prosecutor merely misunderstood the directive given him by the district court. Furthermore, the district judge promptly instructed the jury to ignore the question and ordered the government to abandon the disputed line of inquiry.

■ Even conceding that error was committed in propounding the objectionable question, moreover, such error was clearly harmless under the facts of this case. First, the very information the defense was attempting to keep from the jury had previously been placed before the fact-finders during the cross-examination of Ali's mother. Second, the jury obviously was able to abide by the court's admonition concerning consideration of the evidence. The jurors clearly ignored what might be considered a natural inclination to punish Ali for his unacceptable attitudes and threats toward his wife and, in fact, actually acquitted him of two of the four charges made against him.

### VI. Application of Apprendi to Defendant's Sentence

In a final issue submitted to the court in a supplemental brief, the defendant contends that the Supreme Court's landmark decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), mandates that a jury find that the defendant is responsible for a specific quantity of drugs, beyond a reasonable doubt, before that defendant is sentenced within any particular guideline range. According to Ali, *Apprendi* stands for the proposition that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 490, 120 S.Ct. 2348 (quoting *Jones v. United States*,

526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). Consequently, argues the defendant, because the sentencing guidelines increase the range of punishment to which defendants are subject based upon the quantity of drugs with which the perpetrators are charged, juries in drug cases are required to determine definite drug amounts beyond a reasonable doubt before courts impose punishment according to any but the most lenient guideline range.

■ Contrary to Ali's contention, however, *Apprendi's* reach is limited to the principle that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* (emphasis added). Because this indictment contained no specific drug quantity, and because the jury did not find that the defendant was involved with any designated amount of cocaine, Ali must be sentenced in accordance with the provisions of 21 U.S.C. § 841(b)(1)(C), which mandate a sentence of imprisonment "of not more than 20 years." Consequently, the defendant's sentence of 195 months, or 16 years and three months, does not violate the principles announced in *Apprendi. See United States v. Munoz*, 233 F.3d 410, 413–14 (6th Cir.2000). Moreover, the case of *United States v. Flowal*, 234 F.3d 932 (6th Cir. 2000), on which defense counsel relied at oral argument, is not applicable to the sentencing order in this case.

### CONCLUSION

The defendant has presented this court with numerous issues challenging the propriety of his conviction and sentence. However, because we conclude that none of them resulted in reversible error, we

AFFIRM the judgment of the district court in its entirety.